UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RACK & BALLAUER EXCAVATING CO., INC. *et al.* | : : : | Case No. 1:13-cv-30 |
| Plaintiffs, | : : | Judge Timothy S. Black |
| vs. | : : | |
| CITY OF CINCINNATI *et al.*, | : : | |
| Defendants. | : | |

**ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER (Doc. 3)**

This case is currently before the Court on Plaintiffs' motion for a temporary restraining order. (Doc. 9). Following an informal conference with the Court pursuant to Local Rule 65.1, the parties filed responsive memoranda. (Docs. 7, 9). The motion is now ripe for the Court's review.

### I. BACKGROUND FACTS

Plaintiffs Rack & Ballauer Excavating Co, Inc. ("R&B"), RB South, Inc., and Randy Rack[1] claim that in light of the Municipal Codes and Policies and Procedures of the Defendant City of Cincinnati, Plaintiffs cannot compete on equal footing in the municipal construction bidding process. Plaintiffs claim they are able and ready to bid on contracts but for Cincinnati's discriminatory policies that prevent them from doing so on

---

[1] R&B is an Ohio corporation that employs many individuals with experience providing services to Cincinnati for the installation of complex water and sewer piping projects. RB South is a Kentucky corporation, licensed to do business in Ohio, that employs many individuals with experience providing services to Cincinnati for the installation of complex water and sewer piping projects. Randy Rack is Vice President of R&B and a citizen of the State of Indiana. (Doc. 3 at 3).

an equal basis with other bidders, including Defendant(s) ABC Inc.(s) 1-5.[2]

RB South submitted two bids on the public waterworks projects that are at issue herein, the Ardmore Project and the Dellers Glen Project. (Doc. 3 at 4). RB South submitted the lowest bid for both the Ardmore and Dellers Glen Projects, but it was awarded neither project. (*Id.* at 11). Both RB South and R&B intend to bid on future public projects on which Cincinnati is an owner or on which city, county, state, and federal funds are expended and as to which Cincinnati applies its Apprenticeship Requirement, Pre-Apprenticeship Training Fund, Local Hiring and Disadvantaged Worker Requirements, and other requirements, the lawfulness and constitutionality of which Plaintiffs are challenging in this action. (*Id.* at 4).

The key City Municipal Code ("CMC") sections and practices challenged are:

1. CMC 320-5(b) requiring bidders to employ apprentices at a ratio of at least 20%;

2. CMC 320-7 requiring bidders to pay ten cents per hour per worker into an MSDGC fund 701 for a Pre-Apprenticeship program that ensures that a majority of its trainees are women, people of color, residents of low-income communities, and/or veterans;

3. CMC Chapter 318 in its entirety including the local hire and disadvantaged worker components;

4. Cincinnati's lack of of bid-protest procedure; and

5. Cincinnati's claim of broad discretion in awarding bids.

---

[2] ABC Inc.(s) 1-5 are unknown corporations or entities that submitted bids for the projects, are the second lowest bidders on the projects, and were awarded or will be awarded the projects. (*Id.*)

(*Id.* at 5).

In July of 2012, Cincinnati enacted an Apprenticeship Requirement, that was codified in CMC 320-5, requiring that apprentices be used on every construction contract. (*Id.*) A bidder must employ apprentices at a ratio of at least 20%, employing one apprentice for every four journeypersons. (*Id.* at 6). A bidder not in compliance with the Apprenticeship Requirement shall not be awarded a construction contract. (*Id.*) The failure of a bidder to comply during the performance of a construction contract shall constitute a material breach and may subject the bidder to all remedies available to Cincinnati at law, including (1) disqualification of the bidder from bidding on current or future contract, (2) suspension of payments to the bidder under the construction contract, and (3) termination for cause. CMC 320-5.

Also in July of 2012, Cincinnati enacted the Pre-Apprenticeship Training Fund, codified in CMC 320-7. (Doc. 3 at 6). Contractors are required to pay ten cents "per hour per worker into MSDGC Fund 701 for the purpose of funding qualified Pre-Apprenticeship programs that will create a pipeline of opportunities from recruitment to placement to retention." CMC 320-7. Contractors who pay into an Apprenticeship Program directly are still required to make payment into MSDGC Fund 701. (Doc. 3 at 7).

In April 2012, Cincinnati enacted the Local Hiring Ordinance, codified in CMC Chapter 318. (*Id.*) Chapter 318 is currently suspended and cannot be applied to any bidder until at least March 14, 2013. (Doc. 7 at 2).

Under Chapter 318, "every construction contract that goes out to bid after the effective date of this law shall require that a minimum percentage of between 30% and 40% of all construction worker hours within each trade is performed by local residents, with no less than 20% of all construction worker hours within each trade performed by disadvantaged workers." CMC 318-3. Contractors must certify that one half of their apprenticeship hours shall be performed by local residents. CMC 318-5(c).

Finally, Cincinnati does not provide for any kind of bid-protest procedure to challenge a finding that a bidder is not responsible or that a bid is nonresponsive. (Doc. 3 at 9). Cincinnati does not notify apparent low bidders found not to be responsible and/or responsive in writing via certified or first class mail. (*Id.*) Under CMC 321-43, the lowest bidder may be rejected if the bid is "not in the best interests of the city."

According to Cincinnati, the MSD contracting personnel in this case did not apply the requirements of either Chapter 318 (because of the suspension) or 320 ("because RB South indicated in its bid that it was an exempt entity") to RB South for either bid. (Doc. 7 at 3). In November 2012, Cincinnati notified Scott Rack that RB South would be awarded neither project because "it did not have enough experience." (Doc. 3 at 13). This notice was not in writing. (*Id.*) Cincinnati did not entertain Mr. Rack's written request for a meeting to discuss its rejection of RB South's bids. (*Id.*) The net difference between RB South's bids and the bids that were ultimately accepted is $119,374. (*Id.* at 14).

-4-

## II.	STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *Reid v. Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2 (N.D. Ohio Jan 26, 2011) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996)). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Id.* (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).

Plaintiffs bear the heavy burden of demonstrating its entitlement to a preliminary injunction. An "injunction is an <u>extraordinary</u> <u>remedy</u> which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002). (emphasis supplied).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id.*

These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

### III.  ANALYSIS

The Court finds that Plaintiffs have not alleged facts sufficient to warrant a temporary restraining order.

**A.  Likelihood of Success on the Merits**

Plaintiffs have shown a moderate likelihood of success on the merits.

**1.  Standing**

First, it is unclear whether Plaintiffs have standing to challenge either Chapter 318 or Chapter 320 in this case. Defendants claim that the requirements of neither chapter were applied to RB South for either bid in question. (Doc. 7 at 3).

Chapter 318 is currently suspended until at least March 14, 2013, although Cincinnati claims "its implementation will likely be delayed further." (*Id.* at 5). Plaintiffs are correct in observing that Chapter 318 is still on the books and that pre-enforcement review may be appropriate because it "imposes costly, self-executing compliance burdens." *Minnesota Citizens Concerned for Life v. Federal Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997). However, for review to be appropriate under the Declaratory

Judgment Act, 28 U.S.C. § 2201, Plaintiffs must demonstrate actual present injury or a significant certainty of future harm. *Bras v. California Pub. Utilities Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995), cert. denied, 516 U.S. 1084 (1996). Plaintiffs have made compelling arguments that they "and many other contractors will be forced to reorganize their workforce, change the way they do business, or forego working on these public projects" as a result of Chapter 318, and that due to its imminent implementation, these harms have already begun to accrue. (Doc. 9 at 12). However, as Cincinnati claims that implementation will likely be delayed past mid-March and that a case or controversy "may never occur," it is unclear whether either a present injury or a *significant certainty* of future harm actually exists.

The situation surrounding Plaintiffs' standing to challenge Chapter 320 is even murkier, as Cincinnati claims that it did not inquire into RB South's compliance because RB South "indicated in its bid that it was an exempt entity under Chapter 320." (Doc. 7 at 3). This claim is neither further expounded upon by Defendant nor responded to by Plaintiffs. If such "exempt status" exists, however, and none of the requirements of Chapter 320 are actually requirements that must be met by Defendant(s) now or in the future, then no case or controversy exists around this chapter and Plaintiffs do not have standing to challenge it.

### 2. Chapter 318

If Plaintiffs have do have standing to challenge these provisions, they have provided fairly convincing evidence that Chapter 318 is unconstitutional on the basis that it violates the Privileges and Immunities Clause.

The Privileges and Immunities Clause operates to outlaw classifications based on noncitizenship unless some evidence indicates that noncitizens constitute a peculiar evil at which the statute is aimed. *Toomer v. Witsell*, 334 U.S. 385, 396, 398 (1948); *Hicklin v. Orbeck*, 437 U.S. 518 (1978); *United Building & Construction Trades v. Camden*, 465 U.S. 208 (1984). The Supreme Court has enumerated a two-part test to determine whether a statute violates the Privileges and Immunities Clause: (1) whether the municipality has violated a right that is fundamental to national unity, and (2) whether the municipality had a substantial reason for doing so. *Toomer*, 334 U.S. at 385.

Under the first prong of the *Toomer* test, it is undisputed that a citizen's right to engage in commerce, trade, or business is a fundamental one. *Ward v. Maryland*, 79 U.S. 418, 430 (1870). Under the second prong, Cincinnati has not identified the evil to be remedied, and assuming that evil to be local unemployment, Cincinnati has not provided any evidence that unemployment is occurring to a greater degree locally, that nonresidents and/or non-disadvantaged residents are contributing to that unemployment, or that Chapter 318 would cure that evil, if it exists.

### 3. Chapter 320

Again assuming standing, Plaintiffs have also provided fairly convincing evidence that Chapter 320 is preempted by ERISA. The Supreme Court has noted that the ERISA preemption clause is "conspicuous for its breadth" and "establishes as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee

benefit plan governed by ERISA." *FMC Corp. v. Holliday*, 111 S.Ct. 403, 407 (1990). As the Sixth Circuit held *Assoc. Builders & Contrs. v. Mich. Dep't of Labor & Econ. Growth*, "what triggers ERISA's potential application to these laws is not the existence of an apprenticeship training program * * * but the existence of a separate fund to support the training program." 543 F.3d 275, 282 (6th. Cir. 2008), citing *Cal. Div. Of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 513 U.S. 316, 326 (1997).

For purposes of ERISA, 29 U.S.C. 1144(a), a law relates to an employee-welfare plan if it (i) has a connection with or (ii) a reference to such plan. ERISA preemption applies "where a state law acts individually and exclusively on ERISA plans or where the existence of an ERISA plan is essential to the law's operation." *Dillingham*, 519 U.S. at 325.

Here, Plaintiffs have provided significant evidence that Cincinnati's health insurance, pension, and apprenticeship mandates impermissibly relate to ERISA plans, and are thus preempted. *See Blue Cross & Blue Shield v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995) (ERISA preempts state laws that mandate employee benefit structures or their administration); *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 852 (1st Cir. 1993) ("a state statute that obligates an employer to establish an employee benefit plan is itself preempted"); *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 723 (9th Cir. 1997) (there are three areas in which ERISA was intended to preempt state law; the first includes state laws that mandate employee benefit structures or their administration). Here, by its very language, Chapter 320 includes mandatory-

requirement provisions (including the pension, healthcare, and welfare plan requirements) that relate to employee-welfare plans. Chapter 320 requires bidders to certify that they provide or contribute to a health care plan and contribute to an employee pension or retirement program. CMC 320(j) and (k). It appears unrefuted that these types of employee-welfare programs are preempted by ERISA. *See Utility Contractors Ass'n of New England v. City of Fall River*, 2011 U.S. Dist. LEXIS 114333 (D. Mass. Oct. 4, 2011); *Standard Oil Co. of California v. Agsalud*, 442 F.Supp. 695, 711 (N.D. Cal. 1977), aff'd, 633 F.2d 760 (9th Cir. 1980), aff'd mem., 454 U.S. 801 (Hawaii state law mandating employers provide comprehensive prepaid health care to employees preempted by ERISA); *Catholic Charities of Maine, Inc. v. City of Portland*, 304 F.Supp.2d 77, 92 (D.Me. 2004) (Maine ordinance requiring city-funded employers to provide health and employment benefits to domestic partners preempted under ERISA); *District of Columbia v. Greater Washington Bd. Of Trade*, 506 U.S. 125, 127-129 (1992) (finding D.C. law requiring employers to provide health insurance to worker compensation recipients preempted by ERISA).

    **4.  Wide Discretion and Lack of Bid-Protest Procedures**

Plaintiffs have not, however, provided significant evidence that Cincinnati's failure to provide a bid-protest procedure and wide discretion in accepting and rejecting bids violates the Ohio Revised Code ("R.C.") or the U.S. Constitution.

R.C. 9.312, the statute that Plaintiffs allege is violated by Cincinnati's failure to provide for a bid-protest procedure and not-responsible/nonresponsive notification in

writing by certified mail (or first class mail when awarded under R.C. 125.11), is a permissive statute. (Doc. 7 at 11). The statute provides that a "municipal corporation" or a "board of county commissioners" (among other political subdivisions) *may* adopt a policy requiring contracts be awarded to the lowest responsive and responsible bidder. R.C. 9.312(C). When a city or county adopts such a policy, it is subject to the requirements of the rest of R.C. 9.312, including the bid-protest procedure and written notification requirements. No evidence has been presented showing that either Cincinnati or Hamilton County has adopted such a policy, and, in fact, CMC 321-43 provides that bids may be rejected for any reason or for no reason, if the bid is not in the best interests of the city.

To demonstrate a due process violation, Plaintiffs must have a protected property interest in the publicly-bid contract, which can be demonstrated in one of two ways: "a bidder can either show that it actually was awarded the contract and then deprived of it, or that, under state law, the county had limited discretion, which it abused, in awarding the contract." *Enertech Elec. v. Mahoning Cty. Commrs.*, 85 F.2d 257, 260 (6th Cir. 1996) (citing *United of Omaha Life Insurance Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992) and *Peterson Enterprises, Inc. v. Ohio Department of Mental Retardation and Developmental Disabilities*, 890 F. 2d 416 (6th Cir. 1989)); *see also Ohio Asphalt Paving, Inc. v. Board of Commissioners of Coshocton County, Ohio*, 2005 U.S. Dist. LEXIS 12033, at *9-10 (S.D. Ohio, June 17, 2005).

Here, there is no evidence that Plaintiffs were ever awarded either contract or that Cincinnati's discretion was limited in rejecting Plaintiffs' bids. Furthermore, the Sixth Circuit has recognized that disappointed bidders have access to due process through the ordinary judicial process in Ohio. *Trihealth Inc. v. Bd. of Comm'rs,* 430 F.3d 783, 794 (6th Cir. 2005).

**B.    Whether Plaintiffs Will Suffer Irreparable Harm**

Because Plaintiffs are seeking money damages for the allegedly wrongfully awarded bids, and because such damages remain available for disappointed bidders in Ohio, Plaintiffs will not suffer irreparable harm in the absence of a temporary restraining order. *Meccon, Inc. v. Univ. of Akron*, 933 N.E.2d 231 (Ohio 2010). To the extent Plaintiffs are asserting a Section 1983 violation, state law "cannot limit [their] right to recover damages for a federal constitutional injury." (Doc. 7-2 at 8). Plaintiffs themselves acknowledge the potential for money damages in federal court to address their claims with their request for both compensatory and punitive damages. (Doc. 2 at ¶¶ 129-143).

**C.    Whether the Issuance of an Injunction Would Cause Substantial
        Harm to Others Or the Public**

The final element for granting injunctive relief requires that such relief not harm third parties or the public. There is compelling evidence that both third parties and the public would be harmed by the issuance of a temporary restraining order.

As Cincinnati points out, "[t]he bids have been awarded and Ford Development is doing work pursuant to its contracts with the MSD." (Doc. 7 at 13). If Plaintiffs wanted to enjoin the provisions and policies in question they could have filed suit at any point during the bidding process, but, instead, they waited to do so until after work had begun (*Id.*) The public interest is best served by the timely completion of the project, uninterrupted by legal process, given the backstop of potential recovery of money damages if a bidder were unlawfully precluded. Stopping work now will not only delay completion of public infrastructure and harm the public, but will also cause harm to Ford Development and its workers and subcontractors.

### IV. CONCLUSION

The Court finds that Plaintiffs have not met their extraordinary burden of establishing by clear and convincing evidence their entitlement to a temporary restraining order. Accordingly, Plaintiffs' motion for a temporary restraining order (Doc. 3) is **DENIED.**

**IT IS SO ORDERED**.

Date: 2/8/13    *s/ Timothy S. Black*
Timothy S. Black
United States District Judge